Francine REED, Individually and as the
Executrix of the Estate of Mitchell
Tunstall Reed

v.

UNITED STATES of America.

Civ. A. No. 81–2930.

United States District Court,
E.D. Louisiana.

Feb. 8, 1984.

James W. Brodtmann, Richard A. Tonry,
Chalmette, La. and Floyd J. Reed, New
Orleans, La., for plaintiff.

Roy F. Blondeau, Jr., Asst. U.S. Atty.,
New Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. Plaintiff, Mrs. Francine Reed, filed suit individually and as the executrix of the estate of her deceased husband, Mitchell Tunstall Reed, against the United States of America under the provisions of the Federal Tort Claims Act. She seeks damages for the alleged wrongful death of her husband

as a result of hospital negligence and physician malpractice during 1979 when he was a patient in the United States Public Health Hospital in New Orleans, Louisiana.

2. Mitchell Reed was first seen at the Public Health Service Hospital in New Orleans on September 21, 1979. He complained of hoarseness, discomfort in swallowing and a lump in the side of his neck. The staff physician in the hospital's general clinic performed an examination and found a lesion in his throat. Mr. Reed was referred to Dr. Rutledge, the hospital's ear, nose and throat specialist, for a more thorough examination.

3. On September 25, 1979, Dr. Rutledge obtained a full history, made a physical examination, and performed a fiber optic nasal pharyngoscopy on Mr. Reed's neck.

The history revealed that Mr. Reed was hypotensive, a diabetic, a heavy smoker and drinker, and indicated that he had suffered a heart attack in the past. Physical examination showed him to be obese and suffering from cirrhosis of the liver, presumably the result of heavy drinking. The fiber optic evaluation indicated the possibility of cancer of the larynx. Mr. Reed was admitted to the hospital.

4. On September 28, 1979, tests were performed on the suspected cancerous growth in Mr. Reed's neck and lab reports indicated squamous carcinoma of the supra-glottic region (cancer of the area just above the vocal cords). Mr. Reed was scheduled for a radical neck dissection with either a partial or total laryngectomy, in an effort to remove the tumor on October 16, 1979.

5. The medical team selected to perform the surgery on October 16, 1979, consisted of Dr. Manuel Feliberti, surgeon; Dr. John VerHulst, surgical assistant; and Dr. Vu, anesthesiologist. Before surgery began, as Mr. Reed was being prepped, the anesthesiologist, Dr. Vu, was called away to an emergency elsewhere in the hospital. He was replaced by Dr. William A. Beauchamp who had been the anesthesiologist during the process necessary for the biopsy which had been performed one month previous.

He was assisted in the preoperative phase of his work by Ms. Ann Pearce, a nurse anesthetist.

6. Drs. VerHulst and Feliberti made a decision to ventilate the patient during surgery by using a nasal tracheal tube rather than performing a tracheostomy. Intubation of the patient would keep the surgical field clear and a tracheostomy would cause complications if it subsequently became necessary to remove all of the larynx as opposed to only a part of it. This decision was communicated to Dr. Beauchamp who, along with the aid of Nurse Pearce, proceeded to intubate Mr. Reed and administer a general anesthetic.

7. At approximately 11:00 a.m., the surgeons began the operating procedure which progressed until approximately 12:30 p.m. At that time, Dr. Beauchamp noticed that Mr. Reed's blood pressure had dropped and, simultaneously, the surgeons observed the presence of "black blood" in the operating field indicating a lack of oxygen. Instruments monitoring Mr. Reed indicated that he was bradycardic (slow pulse) and hypotensive (low blood pressure). The change appears to have been sudden and without warning. The surgeons aborted the radical neck dissection, administered cardiopulmonary resuscitation and performed an emergency tracheostomy to assist in getting oxygen to the patient.

8. When Mr. Reed's vital signs were stabilized, the surgeons made the decision to close the incisions and return him to the intensive care unit without completing the surgery. Mr. Reed remained in the intensive care unit in a comatose state, never regaining consciousness. He died on December 26, 1979.

9. An autopsy was performed the day of Mr. Reed's death by Dr. Ronald Reeves, a staff pathologist at the Public Health Service Hospital. Dr. Reeves' findings indicated that Mr. Reed suffered from severely occluded coronaries, especially the vessels surrounding the heart. More specifically, his finding was that all of the coronaries were, at some point in their dis-

tribution, at least 75 percent or more occluded. Dr. Reeves also confirmed the previously diagnosed presence of squamous cell carcinoma (infiltrating cancer) of the larynx, and also discovered lymph nodes on both sides of the neck in the cervical chain bilaterally that were cancerous. Mr. Reed's liver was grossly enlarged and he suffered from severely advanced cirrhosis of the liver. He also had bilateral pulmonary emphysema, a disease of the lungs and consistent with Mr. Reed's history of heavy smoking.

10. In connection with the pathological findings relating to Mr. Reed's sudden drop in pulse and blood pressure during his surgery on October 16, 1979, Dr. Reeves confirmed the fact that Mr. Reed had developed cerebral anoxia, or lack of oxygen to the brain. He concluded that this was caused by decreased blood flow to the brain which resulted from the previously mentioned circulatory deficiency and a probable cardiac arrest during surgery.

11. Finally, regarding the ultimate cause of death on December 26, 1979, Dr. Reeves found that Mr. Reed died of a massive pulmonary embolism (a blood clot which obstructed the flow of blood to the heart) compounded by the previously mentioned severe arteriolosclerotic vascular disease.

### Conclusions of Law

1. The court has jurisdiction over this suit based upon the Federal Tort Claims Act, 28 U.S.C. 2671, *et seq.* and 28 U.S.C. 1346. Under the Federal Tort Claims Act, the substantive law of the state where the act or omission occurred applies in determining the liability of the United States. 28 U.S.C. 2672.

2. Louisiana Revised Statute 9:2794, as enacted in 1975 by Act No. 807 of the Legislature, places upon the plaintiff in a medical malpractice action the burden of proving "the degree of care ordinarily practiced by physicians and dentists within the involved medical specialty," R.S. 9:2794(A)(1); "that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill," R.S. 9:2794(A)(2); and "that as a proximate result of this lack of skill or knowledge or the failure to exercise this degree of care plaintiff suffered injuries that would not otherwise have been incurred," R.S. 9:2794(A)(3). The statute also provides "that injury alone does not raise a presumption of the physician's or dentist's negligence," R.S. 9:2794(C). That provision is immediately succeeded by one which states that "(t)he provisions of this Section shall not apply to situations where the doctrine of *res ipsa loquitur* is found by the court to be applicable." R.S. 9:2794(C).

3. Applying these statutory guidelines to the case at bar, I turn first to the question of whether the theory of *res ipsa* applies to these facts. Plaintiff does not raise the presumption on her behalf, but for the sake of completeness, I have reviewed its applicability to the factual circumstances of the case.

The landmark decision in our jurisprudence concerning the doctrine of *res ipsa loquitur* is *Larkin v. State Farm Mutual Automobile Ins. Co.*, 233 La. 544, 97 So.2d 389 (1957). Therein, the court stated:

"... the maxim (res ipsa loquitur) means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that the rule rests for its justification upon the common experience that accidents from such causes do not commonly occur in the absence of negligence; and that it is the lack of direct evidence indicating negligence on the part of the defendant as the responsible human cause of a particular accident which actually furnishes the occasion and necessity for invoking the rule in its strict and distinctive sense. It is generally conceded that *res ipsa* in no way modifies the rule that negligence will not be presumed. The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the

plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence, thereby obtaining an advantage and placing on the defendant the burden of going forward with proof to offset that advantage."

97 So.2d at 391.

In *Morales v. Employers' Liability Assur. Corp.*, 202 La. 755, 12 So.2d 804 (1943), the Supreme Court stated:

"It is the duty of the plaintiff to prove negligence affirmatively; and, while the inference allowed by the rule of *res ipsa loquitur* constitutes such proof, *it is only where the circumstances leave no room for a different presumption that the rule applies. When it is shown that the accident might have happened as the result of one of two causes, the reason for the rule fails and it can not be invoked.*" (Emphasis added.)

12 So.2d at p. 808.

■ 4. After reviewing the records and exhibits in this case, I conclude that the facts and evidence introduced do not establish a situation in which defendant's alleged negligence is the most plausible explanation for plaintiff's injuries. The defendant offered reasonable medical opinions as to the cause of Mr. Reed's surgical complications and subsequent death. The physicians who comprised the surgical team and the pathologist who performed the autopsy agreed that while the exact cause of Mr. Reed's comatose state after surgery may not be known, the more likely explanation is that he suffered a heart attack and/or pulmonary embolism; both causally unconnected to anything the physicians did during surgery. It has been held that such an incident, *i.e.* cardiac arrest with a resultant neurological deficit, is one which can occur in the absence of negligence. See, *e.g. McAdams v. Holden*, 349 So.2d 900 (La. App.1977); and *Ewen v. Baton Rouge General Hospital*, 378 So.2d 172, 174 (La.App. 1979). In *McAdams*, the court stated, "the testimony of the experts was that a statistically significant number of cardiac arrests

occur on the operating table for unknown reasons unrelated to the negligence of any party." *Id.* at p. 902.

5. Thus, *res ipsa loquitur* is not applicable in this case. The normal plaintiff's burden under R.S. 2794 (to establish the standard of care ordinarily exercised by physicians within the involved medical specialty under similar circumstances, and that the defendant failed to meet that standard of care) is applicable. Plaintiff has not borne that burden.

■ 6. No evidence was produced to show that any members of the hospital staff were negligent or that their negligence caused Mr. Reed's comatose state or subsequent death. The only live witness produced at trial by plaintiff was Mrs. Francine Reed, the wife of the deceased. The only medical testimony at trial was produced by joint exhibit and consisted of the testimony of various treating physicians previously members of the staff of the United States Public Health Hospital in New Orleans. Plaintiff produced no expert witness or any other witness to testify that there was any malpractice by the staff of the hospital. Under these circumstances, I do not find that plaintiff has borne her burden under R.S. 9:2794.

Defendant is directed to prepare a judgment consistent with these findings.